**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **STEVE KEYS** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 04 C 6403** |
| | ) | |
| **vs.** | ) | |
| | ) | **Mag. Judge Michael T. Mason** |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Steve Keys ("Keys" or "claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Keys' claim for Disability Insurance Benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Keys' motion for summary judgment is granted in part and denied in part, the Commissioner's motion is denied and this case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

**Procedural History**

Keys filed an application for Disability Insurance Benefits ("DIB") on December 26, 2000. (R. 157). His application was denied initially on May 2, 2000 and again on September 24, 2001 after a timely request for reconsideration. (R. 117, 121-125). Keys

requested a hearing, which was held on April 15, 2003 before ALJ Helen Cropper. (R. 129, 49). ALJ Cropper issued a written decision denying Keys' request for benefits on November 5, 2003. (R. 18-48). The Appeals Council subsequently denied Keys' request for review on September 7, 2004, and ALJ Cropper's decision became the final decision of the Commissioner. *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998). Keys subsequently filed this action in the district court.

**Medical Evidence**[1]

Claimant saw Dr. Masi at the occupational health clinic at the West Suburban Hospital Medical Center on December 7, 1999. (R. 503-504). Keys reported that he was awakened at 1:00 a.m. by severe back pain after washing walls and cabinets the previous day at work. (R. 503). Dr. Masi noted that he had a reduced range of motion in the lumbar spine and tenderness in his low back. (*Id.*). However, claimant's gait was normal and his neurological exam was negative, other than a mildly positive straight leg raising ("SLR") sign on the left. (*Id.*). Keys was diagnosed with acute muscular lumbar strain. (R. 504). He was allowed to return to work with lifting and pushing restrictions. (*Id.*).

Claimant saw his chiropractor, Dr. Reagan, on December 10, 1999. (R. 502). He advised claimant to stay off work for a week and noted that claimant has a lumbar disc herniation that is symptomatic. (*Id.*).

A December 14, 1999 MRI showed desiccation (degeneration) of the L4-L5 and L5-

---

[1] Claimant alleges a disability onset of December 7, 1999. However, he apparently attributes his disability to back injuries he suffered at work in 1997 and 1998. (R. 22). The record includes voluminous medical evidence from many different providers, which the ALJ discussed in detail. (R. 22-40). For purposes of clarity and brevity, we concentrate on the medical evidence during the relevant time period, *i.e.*, after claimant's alleged onset date.

S1 discs with broad based central protrusion at the L4-L5 and L5 levels. (R. 555). The MRI revealed no significant neural compression. (*Id.*).

Claimant saw Dr. Masi again on December 16, 1999 for a follow-up. The diagnosis was low back muscle strain. (R. 556). Dr. Masi noted that Keys had a reduced range of lumbar motion, negative SLR and normal strength and gait. (R. 557). Claimant was encouraged to return to work and was released to restricted duty. (*Id.*). Dr. Masi indicated that Keys could perform a sitting job but that he should not lift more than ten pounds or stand or walk more than one half to one hour per day. (R. 556). Dr. Masi saw Keys again on December 27 and December 30, 1999. On both occasions, Dr. Masi diagnosed a lumbar muscle strain and released claimant to sedentary-type work.[2] (R. 55-551, 559-560). Dr. Masi's December 30th report indicates evidence of symptom magnification. (R. 560).

Claimant was seen at Rush Union Health Care on December 27, 1999. The records indicate that he was unable to work from December 23, 1999 until January 4, 2000 due to low back pain. (R. 491). Claimant was referred to Dr. An. (*Id.*).

Claimant went to the West Suburban Hospital ER on January 5, 2000. He complained the he aggravated his back injury at work and had pain running down both legs. (R. 463). Keys had extremely limited range of motion of the back. (*Id.*). He was given an injection of Toradol, prescribed Lodine and referred to Dr. Masi. (*Id.*).

Dr. Masi saw claimant on January 7, 2000. (R. 563-564). Keys complained of back pain radiating into his left leg and both thighs. (R. 563). Dr. Masi reported tenderness of

---

[2] Claimant was restricted to walking/standing for no more than 2-3 hours per day and he was instructed not to wash walls or windows. Dr. Masi also imposed lifting and pushing/pulling restrictions that limited claimant to sedentary work.

the lumbar spine and lumbar paraspinous muscles but no muscle spasm. (R. 564). Claimant had negative SLR signs bilaterally but reduced range of motion of the lumbar spine. (*Id.*). Dr. Masi indicated that claimant could continue to work with restrictions on his lifting, pushing and pulling. (*Id.*).

On January 11, 2000, Keys saw Dr. Howard An of Midwest Orthopedics. (R. 273). He complained of severe back and bilateral leg pain. (*Id.*). The back was tender to palpitation and extension was limited to zero degrees with pain. (*Id.*). The neurological exam was normal with a negative SLR test. (*Id.*). Dr. An noted that the MRI showed mild disc degeneration at L5-S1 without herniation or significant nerve root impingement. (*Id.*). Dr. An also indicated that a discogram would be considered to confirm the discogenic nature of his back pain. (*Id.*). Dr. An prescribed Ultram for the pain. (R. 276). He noted that claimant would not be able to return to work until March 13, 2000. (R. 278).

Claimant returned to the occupational health clinic at the West Suburban Hospital Medical Center on March 13, March 15, and April 3, 2000. (R. 567-572). He continued to complain of back pain radiating to his legs. (*Id.*). He was again released to restricted duty but reported that he was not working. (*Id.*). Claimant's lifting and pushing/pulling restrictions remained the same but he was permitted to stand/walk for 5-6 hours per day. (R. 567, 569, 571). The records indicate normal neurological exam findings, including negative SLR tests while claimant was distracted. (R. 570, 572). Dr. Masi noted evidence of symptom magnification. (R. 570, 572).

Claimant had a lumbar discography on April 13, 2000, at Rush-Presbyterian-St. Luke's Medical Center ("Rush"). (R. 264-265). At L5-S1, the injection resulted in a severe sharp low back pain radiating to the left leg and right thigh. (*Id.*). Keys stated that this was

4

most typical of his usual pain. (*Id.*). The report revealed that the L5-S1 disc appears to be the claimant's primary pain generator but that the L4-5 disc may contribute. (*Id.*).

Claimant underwent an independent medical examination by Dr. Avi Bernstein on April 20, 2000. (R. 587-588). Keys complained of low back and bilateral leg pain. (R. 587). Dr. Bernstein noted that claimant sat comfortably and rose to a standing position without difficulty. (R. 588). He also noted a slow, but "somewhat exaggerated," guarded gate. (*Id.*). There was normal strength, negative SLR testing and no evidence of muscle spasm. (*Id.*). Dr. Bernstein found that claimant had severe subjective complaints of pain that did not correspond to the MRI findings. (*Id.*). He recommended a functional capacity evaluation ("FCE"). (*Id.*).

On April 20, 2000, claimant called Dr. An's office to discuss scheduling back surgery. (R. 336).

On May 19, 2000, Dr. Bernstein reported that he reviewed the recent discogram and found that it was inconsistent with the MRI findings. (R. 589). Therefore, he indicated that he could not recommend surgery. (*Id.*). Again, he recommended an FCE. (*Id.*).

Keys had a spinal fusion on June 19, 2000. (R. 305-307). Dr. An performed the surgery without complication. Keys was discharged on June 23, 2000. (R. 313). On June 24, 2000, claimant was readmitted to Rush for treatment of pancreatitis. (R. 309). During the admission, he had an orthopedic follow-up. (R. 323). He was ambulating well and doing fine in terms of his spine. (*Id.*).

Claimant saw Dr. An twice in July 2000. (R. 330). On July 7, Keys reported that his pain was much improved except that he had some right leg pain to the posterior thigh. (*Id.*). His neurological exam was completely normal. (*Id.*). Dr. An told claimant to continue

ambulating, to wear a back brace and to follow-up in three months. (*Id.*). Dr. An indicated that claimant would not be able to return to work prior to the next appointment in October 2000. (R. 350). On July 28, claimant reported that he needed gallbladder surgery. (R. 330). Dr. An advised Keys to continue walking after the surgery. (*Id.*).

In August 2000, Dr. An completed a form for claimant's disability insurer. He indicated that Keys could begin physical therapy in one to two months and possibly return to work in approximately three months. (R. 348).

Claimant's worker's compensation insurer referred him for medical management services which CCM provided.[3] On September 6, 2000, Keys reported to a CCM representative that the surgery had helped and that he no longer had pain in his legs. (R. 625, 627). Claimant further reported that he was able to perform most of his daily activities and that he could walk two blocks but that he had difficulty bending over and became uncomfortable with prolonged sitting. (R. 627).

On September 22, 2000, Dr. An completed a disability claim form for the claimant. He opined that Keys was continuously disabled from January 11, 2000 until the present and that he could not return to work at that time. (R. 339).

On October 6, 2000, Keys returned to Dr. An for a follow-up. (R. 330). Dr. An's notes indicate that claimant's pain is "better overall." (*Id.*). Keys had minimal leg symptoms and pain in the lumbosacral region posteriorly. (*Id.*). Dr. An instructed claimant to discontinue the back brace and get into exercise and physiotherapy. (*Id.*). He also indicated that claimant would be expected to work with restrictions in one month. (*Id.*). Dr.

---

[3] Claimant had filed worker's compensation claims in 1997 and 1998 based on his work–related back injuries.

An prescribed 3-4 weeks of physical therapy and released claimant to return to work. (R. 352). Claimant was advised to lift no more than thirty pounds and avoid frequent bending and twisting for two months. (*Id.*).[4]

Claimant had several physical therapy sessions in October and November 2000. He complained of lower back pain that had decreased from 8/10 to 7/10 after six weeks. (R. 453). The physical therapist did not think Keys demonstrated pain magnification. (*Id.*). Claimant reported to Dr. An that he continued to have lower back and bilateral leg pain. (*Id.*). Physical therapy was discontinued and claimant was referred for an FCE. (R. 448). Dr. An also refilled Keys' prescriptions. (R. 453).

On December 19, 2000, claimant reported to Dr. An that he did not feel any better and requested refills on his prescriptions. (R. 356). Keys complained of persistent low back pain and left calf pain despite surgery. (*Id.*).

Claimant saw Dr. An for a follow-up on January 5, 2001. (R. 364). He complained of persistent back pain and some pain in the left leg. (*Id.*). The neurological exam was intact and recent x-rays showed good position of the hardware and graft. (*Id.*). Dr. An extended physical therapy for 3-4 more weeks. (*Id.*). The records state that claimant "is not ready to go back to work at this time." (*Id.*). However, a January 8, 2001 CCM progress report indicates that on January 1, 2001, Dr. An told claimant to continue with the same work restrictions (no lifting over 30 pounds and avoid frequent bending and twisting). (R. 621). Claimant reported that he had not returned to work because there were no positions available that fit with his restrictions. (*Id.*).

---

[4] A November 2, 2000 CCM medical progress report also indicates that claimant was released to work as of November 6, 2000 with these same restrictions. (R. 624).

Claimant had twelve physical therapy sessions in January and February 2001. The records reflect no improvement and complaints of pain at 8/10. (R. 369). However, the records also state that the physical therapist had the impression that Keys was not being fully honest, based on the nature of his complaints and his activities during therapy. (*Id.*). Claimant was discharged despite not meeting his goals because "the patient does not respond to [physical therapy]." (R. 431).

Dr. An saw claimant on February 2, 2001. (R. 362). He complained of back pain and left-sided leg pain. (*Id.*). A positive SLR reproduced claimant's left leg pain. (*Id.*). Dr. An ordered a CT scan to rule out stenosis, swelling or nerve irritation. (*Id.*). Claimant's CT scan showed the surgical changes and mild bulging of disc material to the left of the midline. (R. 417). The scan showed no evidence of spinal stenosis. (*Id.*).

At the request of his worker's compensation insurer, claimant returned to Dr. Bernstein on March 12, 2001 for a further evaluation. (R. 590-591). Keys reported that he was no better as a result of his surgery. (*Id.*). He complained of back pain and bilateral radiation with the left leg being worse than the right. (*Id.*). Dr. Bernstein noted that claimant sat comfortably, stood without difficulty, had a normal gait, normal strength and was able to walk heel to toe. (*Id.*). He had limited range of motion and guarding of the low back, minimal tenderness to palpitation and SLR testing caused pulling in the low back. (*Id.*). Dr. Bernstein opined that Keys had reached maximum medical improvement following his lumbar fusion. (R. 591). He recommended an FCE. (*Id.*). Dr. Bernstein further stated that in the absence of an FCE, his opinion was that claimant could perform full-time, light work. (*Id.*).

Keys returned to Dr. An for a follow-up on March 16, 2001. (R. 597). Claimant

reported that he had not improved much with physical therapy.  (*Id.*).  He continued to complain of back and left leg pain, partially relieved with his pain medication.  (*Id.*).  The neurological exam was intact but claimant's extension was limited to ten degrees and he could only flex to the level of his knees.  (*Id.*).  Dr. An noted that claimant's condition hit a plateau and that claimant felt that he was unable to go back to work as a maintenance worker at that time.  (*Id.*).  Dr. An suggested that claimant may need to get into another line of work.  (*Id.*).

Claimant underwent a functional capacity evaluation on March 21, 2001.  (R. 611-615).  The report indicates that claimant discontinued endurance/conditioning testing after 90 seconds due to lower back pain.  (R. 613).  The report reflects that claimant displayed exaggerated pain behaviors during that portion of the testing.  (*Id.*).  The examiner noted that Keys had decreased trunk range of motion and moderate decreased flexibility in the lower extremities.  (R. 611).  He was considered to be able to lift in the "medium" category of work (according to U.S. Department of Labor standards).  (*Id.*).  He demonstrated tolerance of walking, stooping, pivot twisting, overhead reaching, kneeling and stair climbing on an occasional basis and standing, forward reaching and pushing/pulling on a frequent basis.  (*Id.*).  The examiner reported that during the musculoskeletal exam, claimant "scored in the maximal range of 14 out of 16 scores for magnified illness behavior." (*Id.*).

On April 15, 2001, Dr. An formalized claimant's permanent work restrictions.  Dr. An indicated that claimant could perform medium work, that he could lift a maximum of 30 lbs. and that he could frequently lift or carry 25 lbs.  (R. 608).  He further indicated that claimant could lift 30 lbs. floor to knuckle, 25 lbs. knuckle to shoulder and 15 lbs. shoulder to

overhead.  (*Id.*).  He also restricted claimant to a maximum carrying capacity of 30 lbs. per 100 feet.  (*Id.*).  Dr. An did not indicate that claimant was otherwise limited in his ability to work.  (Id.).

On April 11, 2001, Dr. Stanley Rabinowitz performed a consultative exam on claimant.  (R. 374-377).  Claimant complained of low back pain which he described as "worse than before the operation."  (R. 374).  He claimed that the pain radiated down his legs.  (*Id.*).  He rated the low back pain as an average 9-10/10.  (*Id.*).  Claimant reported that he had difficulty bending and could lift no more than a gallon of milk.  (*Id.*).  Dr. Rabinowitz noted that the exam was limited because of Keys' complaints of generalized pain with all range of motion testing.  (R. 376).  He further noted that there was "significant symptom magnification evident."  (*Id.*).  SLR could not be assessed because of complaints of pain with minimal elevation of the legs.  (R. 376).  Dr. Rabinowitz noted that the examination did reveal severe limitation in range of motion testing with evident pain but no muscle spasm.  (*Id.*).  Claimant's neurological examination was normal.  (*Id.*).

Claimant returned to Dr. An on July 6, 2001 for a follow-up.  (R. 451).  He complained of back pain with prolonged walking, bending and twisting.  (*Id.*).  The neurological exam remained normal but claimant had decreased range of motion of the lumbar spine.  (*Id.*).  Dr. An noted that claimant's FCE was consistent with a 30 lb. lifting restriction and no frequent bending or twisting.  (*Id.*).  Claimant was told to find a job within his permanent restrictions.  (*Id.*).  Dr. An completed a spinal impairment form for claimant on the same day.  (R. 379-380).  He indicated that claimant had reduced range of motion and muscle spasms and that claimant complained of low back and left calf pain.  (R. 380).  Dr. An reiterated claimant's work-related restrictions as set forth above.  (*Id.*).  Claimant

apparently did not return to Dr. An after the July 6, 2001 visit.

Dr. Rabinowitz examined claimant again on August 29, 2001. (R. 383-386). Keys complained of low back pain radiating into the buttocks and down the legs into the feet. (R. 383). Claimant reported that he could lift 25 lbs., stand for one hour, sit for less than an hour and walk for five minutes. (*Id.*). He also indicated that he could perform his daily activities. (*Id.*). Dr. Rabinowitz again noted ample symptom magnification. (R. 384). The doctor noted limited range of motion in the lumbo-thoracic spine and negative SLR in a sitting position. (R. 385). The neurological examination did not reveal evidence of nerve root irritation and there was no evidence of paravertebral muscle spasm or joint inflammation. (*Id.*).

Claimant had an initial visit with Dr. Ricado Gonzalez, a family practitioner, the next day. Keys complained of low back pain radiating into both legs. (R. 686). Dr. Gonzalez prescribed Ultram and Neurontin and advised claimant to follow-up with his neurologist. (R. 685).

On September 5, 2001, Dr. Mahim Vora completed a psychiatric consultative exam. (R. 390-391). Claimant reported depression for four years with increased depression in the past year due to his back problems. (R. 390). Keys admitted that he attempted suicide six months ago by overdosing on pills but that he made himself throw up. (*Id.*). Claimant reported crying, insomnia, decreased appetite, and lack of socialization. (*Id.*). Claimant could not complete serial sevens and Dr. Vora suggested that he would be unable to manage his own funds. (R. 391). Dr. Vora diagnosed major depressive disorder and generalized anxiety disorder. (*Id.*). He advised claimant to see a psychiatrist. (*Id.*).

On September 17, 2001, Dr. Terry Travis, a non-examining state agency

11

psychiatrist, completed a mental residual functional capacity ("RFC") assessment. (R. 408-411). He opined that claimant was moderately limited in his ability to understand, remember and carry out detailed instructions, and in his ability to maintain attention and concentration for extended periods. (R. 408). Dr. Travis also found that claimant was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 409). Nevertheless, Dr. Travis opined that claimant was capable of performing unskilled work despite his situational depression stemming from his back problems. (R. 410).[5]

Claimant went to the Oak Forest Hospital ER on November 2, 2001, complaining of low back pain and bilateral leg pain. (R. 699). There was paraspinal tenderness and the SLR was positive at 30 degrees bilaterally. (*Id.*). The other neurological exam findings were normal. (*Id.*). His prescriptions were filled and he was advised to follow-up in the ortho clinic and with his primary care provider. (R. 700).

On November 13, 2001, claimant saw Dr. Gonzalez for a second time. (R. 685). He complained of low back pain. (*Id.*). The records indicate that claimant's gait was slow but the neurological exam findings were negative. (*Id.*).

Claimant returned to the Oak Forest Hospital ER on January 23, 2002. (R. 691-695). He complained of low back pain radiating into his legs that had increased in the last two to three days after working around the house. (R. 691). He had run out of his prescription medication. (*Id.*). The doctor refilled his prescriptions for Ultram and Neurontin and advised claimant to avoid activity that worsens his pain, including bending and lifting

---

[5] This mental RFC assessment was also signed by John Griffin on September 13, 2001. It appears that Dr. Travis adopted Griffin's RFC assessment.

weights. (R. 692). Claimant was instructed to find a primary care doctor for ongoing care. (R. 692, 695).

On May 16, 2002, claimant went to the South Suburban Hospital ER. (R. 632-639). He complained of low back pain. (R. 638). Claimant reported that he had been performing some strenuous activities but denied any specific trauma. (*Id.*). His back was tender on examination and his gait was steady. (R. 636, 638). Claimant was diagnosed with exacerbation of chronic back pain. (R. 639). The doctor prescribed Vicodin and told claimant to follow-up with Dr. Gonzalez or his orthopedic surgeon. (R. 639).

Claimant returned to the South Suburban Hospital ER on May 28, 2002, complaining of continued low back pain radiating to his legs and left foot. (R. 640-648). The left SLR test was positive but the remainder of the exam was unremarkable. (R. 648).

On July 5, 2002, claimant had an office visit with Dr. Gonzalez. (R. 684). He complained of chronic low back pain radiating into both legs, worse on the left. (*Id.*). The SLR test was positive bilaterally at 35 degrees. (*Id.*). Dr. Gonzalez prescribed Ultram and Neurontin as well as another round of physical therapy. (*Id.*). Claimant did not return after the initial physical therapy assessment, purportedly because of lack of insurance. (R. 652).

Claimant saw Dr. Gonzalez next on November 18, 2002. (R. 683). He complained of low back pain in the lumbo-sacral area and indicated that he was out of his medication. (*Id.*). Dr. Gonzalez refilled claimant's prescriptions and advised him to return to his neurologist. (*Id.*).

On February 6, 2003, claimant went to the South Suburban Hospital ER. (R. 663-675). He complained of abdominal and back pain. (R. 647). He was diagnosed with recurrent pancreatitis. (R. 675). He followed-up with Dr. Gonzalez the next day,

13

complaining of abdominal pain. (R. 683).

Claimant went to the Sherman Hospital ER on February 24, 2003, after he was involved in a motor vehicle accident. (R. 708). He complained of neck, shoulder and paraspinal back pain. (*Id.*). His back, neck, extremity and neurological exams were normal. (R. 709). His affect was described as normal. (R. 710). He was diagnosed with a thoracic and lumbar strain. (R. 710). He was prescribed medication and advised to follow-up with a primary care physician in Elgin. (*Id.*).

Claimant saw Dr. Gonzalez again on March 24, 2003. (R. 682). He complained of low back pain. (*Id.*). Dr. Gonzalez noted that claimant looked depressed. (*Id.*). The SLR was positive at 45 degrees bilaterally. (*Id.*). Dr. Gonzalez ordered an x-ray, refilled claimant's prescriptions and referred him to a neurologist. (*Id.*).

Dr. Gonzalez also completed a lumbar spine RFC questionnaire on March 24, 2003. (R. 678-681). He diagnosed claimant with chronic low back pain and noted that his prognosis was guarded. (R. 678). Claimant's symptoms included depression and low back pain. (*Id.*). Dr. Gonzalez noted swelling, muscle spasm and positive SLR at 45 degrees bilaterally. (R. 679). He concluded that claimant would frequently experience pain severe enough to interfere with the attention and concentration needed to perform simple work tasks. (*Id.*). Dr. Gonzalez also indicated that claimant's impairments lasted or could be expected to last for at least twelve months. (*Id.*). He opined that claimant could stand for only 15 minutes at a time and that he could sit, stand or walk for less than two hours in an eight-hour work day. (R. 680).

**Claimant's Testimony**

Claimant lives with his wife and step-daughter. (R. 58). He attended twelfth grade

14

but did not graduate or get a GED. (R. 60). Claimant had vocational training to be a custodian and a nursing assistant. (*Id.*). He can read and write, do basic arithmetic and has a valid driver's license. (R. 61).

Claimant testified that he has not worked since his employment with Oak Park ended in 1999.[6] (R. 65-66). Claimant was a maintenance worker for the Village of Oak Park. (R. 62).

Claimant said that he could not work now because his back would not allow it. (R. 67). He testified that Dr. An thought he could go back and do some type of work. (R. 69). He disagreed with Dr. An's limitations and claimed that 30 lbs. was too much for him to lift. (R. 96). Claimant testified that after Dr. An explained his permanent work restrictions, he did not attempt to find work within those restrictions. (R. 73). He said, "I tried to get disability and that was it." (*Id.*).

He testified that his lower back and sometimes his middle back hurt. (R. 76). He explained that the pain is all the way across his back and goes down into both legs and sometimes his feet. (*Id.*). He notices the pain in his legs and feet mostly when he is driving or walking. (*Id.*). Claimant testified that driving, walking and laying down in certain positions makes the pain worse. (R. 77). However, sometimes he does not have to do anything for the pain to increase. (R. 77, 94). Claimant has pain everyday, but at different levels. (R. 77). Claimant takes Ultram and Neurontin for his pain everyday. (R. 77-78). He occasionally uses a TENS Unit to control the pain. (R. 92). He goes to the emergency

---

[6] Claimant testified that a year prior to the hearing, he temporarily filled in for a driver in Elgin who drove kids to school. (R. 62). He did that work for a couple of days and was paid cash. (Id).

room when the pain gets up to a 10 if the medication does not ease his pain.  (R. 90-91)

Claimant also testified about his depression.  (R. 80-81).  He was not being treated for the depression at the time of the hearing.  (R. 80).  Claimant testified that he did not want to go to a mental health clinic or take medication for the depression. (R. 81-82).  He explained that his sister takes medication and she says it makes things worse.  (R. 82).  Sometimes claimant talks to his wife, which helps.  (R. 81-82).  He also goes to his Jehovah's Witness meetings.  (R. 83).

Claimant's typical day involves him driving his wife to work, watching TV, sleeping and picking his wife up from work.  (R. 85-86).  His wife and daughter take care of the household chores but claimant sometimes cooks or washes the dishes.  (R. 86).  Claimant goes to church two to three days a week for an hour and a half.  (R. 87).  He also does door-to-door ministry two times per week for an hour.  (R. 100-101).  He does not climb stairs or walk long distances.  (R. 101).  Claimant testified that he does not sleep well at night, but that he usually sleeps between 10:00 a.m. and 1:00 p.m. during the day.  (R. 97).  He also said that he has a hard time concentrating and cannot read for more than 15 minutes at a time.  (R. 98).

Claimant testified that the most he can lift is 15 to 20 lbs.  (R. 87).  He said he could stand comfortably for maybe 15 minutes and try to walk a block.  (R. 88).  Claimant further testified that he could sit comfortably in a good chair for 30 to 40 minutes before he would have to get up and walk a minute.  (R. 88-89).  Claimant drives himself to church meetings and his wife to work but he testified that he is not comfortable driving because he has pain. (R. 92).

Claimant has not seen an orthopedic specialist since his last appointment with Dr.

An in March 2001. He said that Dr. Gonzalez is trying to get him to see one. (R. 70). However, he is waiting to get a medical card because he no longer has insurance through his wife's work. (R. 60, 66, 69-70). Claimant testified that he did not attend the physical therapy sessions prescribed by Dr. Gonzalez last July because he no longer had insurance. (R. 80). He did not use his worker's compensation settlement money for the physical therapy because he needed it for other expenses and he still thought he was going to get a medical card. (*Id.*).

**Vocational Expert's Testimony**

Randall Strahl testified as the vocational expert ("VE"). (R. 103). The VE described claimant's past work as a tank washer as heavy and semi-skilled. (R. 104). His past work as a truck driver's helper and maintenance worker was heavy and unskilled. Claimant's past work as a parking attendant was sedentary to light and unskilled. (*Id.*).

The ALJ asked the VE to consider a hypothetical person with the same age, education and past relevant work as the claimant. (R. 105). The ALJ then asked the VE to assume that the individual had the RFC to perform a full range of light work with the following exceptions: the individual could not do constant, repetitive pushing or pulling against resistance with either leg; he could not climb ladders, ropes or scaffolds; he could occasionally climb ramps and stairs and balance, stoop, kneel, crouch or crawl; and he could not be exposed to unprotected heights or unguarded hazardous equipment. (*Id.*). The VE testified that such an individual could perform claimant's past job as a part-time parking attendant. (*Id.*).

The VE also testified that in the Chicago region, there are other positions that the hypothetical individual could perform, including: 1,800 security attendant positions, 2,400

17

office cleaner positions and 1,600 cashier positions.  (*Id.*).

If the hypothetical individual was limited to sedentary work, he could still perform claimant's past job as a part-time parking attendant.  The VE testified that such an individual could also perform work as an inspector (900 positions), an office clerk (1,600 positions) and a security attendant (800 positions).  (R. 106).

The VE further testified that his opinion would not be affected if the hypothetical individual was moderately limited in his ability to understand, remember and carry out detailed or complex tasks or if the individual was moderately limited in his ability to maintain attention and concentration for extended periods.  (*Id.*).  However, the VE testified that his opinion would be affected if the hypothetical individual was moderately limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms.  (Id.).  The VE's opinion also would be affected if the individual was moderately limited in his ability to perform at a consistent pace without an unreasonable amount of rest periods.  (*Id.*).

The VE explained that employers tolerate ten percent downtime or off-task time.  (*Id.*).  Anything over that would not be tolerated.  (*Id.*).  The VE testified that if the individual was frequently off-task or had a marked limitation in his ability to sustain concentration or pace, such an individual would not be able to perform competitive work.  (R. 107).

The VE also testified that none of the jobs he discussed would permit the individual to stand at will (as those jobs are performed in the national economy).  (R. 106-107).

**LEGAL ANALYSIS**

**I.     Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free

18

from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## II. Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant

is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [he] can perform [his] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that claimant had not engaged in substantial gainful activity since the alleged onset of the disability. (R. 47). At step two, the ALJ found that claimant's history of back injury is a severe impairment. (*Id.*). However, the ALJ also found that the record did not establish that claimant suffered from a severe digestive or mental impairment, or that he had such an impairment for a consecutive twelve-month period during the relevant time. (*Id.*). At step three, the ALJ determined that claimant's back impairment "does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (*Id.*). Next, the ALJ found that the claimant had the physical and mental RFC to perform and sustain a wide range of unskilled light and sedentary work. (*Id.*). At step four, the ALJ determined that claimant could perform his past work as a parking booth attendant. (*Id.*). In the alternative, at step five, the ALJ found that there were a significant number of jobs in the national economy that claimant could perform. (R. 48).

Keys argues that the ALJ erred at step two in determining that his depression and anxiety disorder were not severe impairments. Claimant also contends that the ALJ erred in failing to consider his mental impairments in determining his mental RFC. Keys further contends that the ALJ erred because she ignored favorable medical evidence and she failed to give proper weight to treating source opinions. Finally, claimant argues that the ALJ's credibility assessment was improper.

## III.    The ALJ Erred In Determining Claimant's Mental RFC.

The ALJ found that the record did not establish that claimant suffered from a severe mental impairment. (R. 21-22, 47). Nevertheless, in determining a claimant's RFC, the ALJ must consider all mental and physical impairments, even if they are not severe. SSR 96-8p (stating that "in assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"); *see also, Masch v. Barnhart,* 406 F. Supp. 2d 1038 (E.D. Wis. 2005). Here, the ALJ recognized that once she determined that a severe impairment existed (*i.e.*, claimant's back injury), she was required to consider all medically determinable impairments in the remaining steps of the sequential analysis. (R. 21). Accordingly, the ALJ considered claimant's alleged depression in her analysis. (R. 21-22).

However, in cases where the claimant presents evidence that he or she suffers from a mental impairment, the ALJ must follow a "special technique" prescribed by the regulations. 20 C.F.R. § 404.1520a(a); *see also, Lowe v. Barnhart*, 2004 U.S. Dist. LEXIS 19609, *22 (N.D. Ill. 2004). The ALJ is required to document application of the technique in her decision. 20 C.F.R. § 404.1520a(e). Indeed, the ALJ's decision must include a specific finding as to the degree of limitation in each of the functional areas described in

paragraph (c).  20 C.F.R. § 404.1520a(e)(2).  Paragraph (c) identifies "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 404.1520a(c)(3).

Despite the clear requirements of § 404.1520a, ALJ Cropper failed to include a specific finding as to the degree of limitation in any of the functional areas described in paragraph (c).  The ALJ simply outlined the medical evidence related to claimant's mental impairment and concluded "that claimant's mental RFC is not significantly limited by depression or other mental impairments."  (R. 36, 39, 44).

Because the ALJ failed to follow or document the "special technique" set forth in § 404.1520a, we cannot conclude that the ALJ's mental RFC determination is supported by substantial evidence and free from legal error.  Accordingly, remand is appropriate.  On remand, the ALJ must comply with § 404.1520a.

## IV.  The ALJ's Physical RFC Determination Is Not Supported By Substantial Evidence Or Free From Legal Error.

The ALJ found that Keys has the physical RFC to perform and sustain most light work.  (R. 44).  Specifically, the ALJ found that claimant can lift, carry, push and/or pull 20 lbs. occasionally and 10 lbs. frequently; he can sit, stand and/or walk throughout an ordinary workday, with normal breaks; he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; he should not perform work which requires constant use of foot controls against resistance; and he should never climb ladders, ropes or scaffolds, or work at unprotected heights or around unguarded hazardous equipment.  (*Id.*).  The ALJ also noted that claimant's ability to use his hand is not significantly limited.  (*Id.*).

**A.      The ALJ Failed to Consider the Evidence in its Entirety.**

Keys argues that the ALJ erred in finding that the claimant has the RFC to sustain most light work because she failed to analyze evidence unfavorable to the Commissioner. An ALJ is not required to address every piece of testimony and evidence. *Carroll v. Barnhart*, 291 F. Supp. 2d 783, 798 (N.D. Ill. 2003) (quoting *Stephens v. Heckler*, 766 F. 2d 284, 287 (7th Cir. 1985)).   However, an ALJ may not select and discuss only that evidence which favors her ultimate conclusion, but must articulate, at some minimum level, her analysis of the evidence to allow us to trace the path of her reasoning. *Diaz*, 55 F.3d at 307.

Here, the ALJ outlined claimant's medical history in detail.   Indeed, the ALJ spent nearly twenty pages of her opinion detailing the medical evidence and medical source statements.  (R. 22-40).   However, the ALJ offered almost no analysis of the medical evidence.  Instead, the ALJ analyzed only the medical source statements. (R. 39-40). ALJ Cropper indicated that she gave greater credit to Dr. An's opinion than to Dr. Gonzalez's opinion and explained her reasons for doing so.  (R. 40).  Yet the ALJ failed to articulate any analysis of the voluminous medical evidence (other than the medical source statements) to allow this Court to trace the path of her reasoning.

For instance, the ALJ failed to discuss that in November 2000, the same month Keys was released to work, he complained of lower back pain that had only decreased from 8/10 to 7/10 after six weeks of physical therapy.  (R. 453).  The physical therapist did not think Keys demonstrated pain magnification.  (*Id.*).   The ALJ also never addressed Dr. An's February 2001 report showing a positive SLR that reproduced claimant's left leg pain.  (R. 431).  On November 2, 2001, claimant went to the Oak Forest Hospital ER complaining of

low back pain and bilateral leg pain. (R. 699). The records reflect paraspinal tenderness and a positive SLR at 30 degrees bilaterally. (*Id.*). Again, the ALJ's opinion included no discussion of this evidence. These are just a few examples of the ALJ's failure to analyze claimant's lengthy medical history.

ALJ Cropper specifically stated that she based her RFC determination on all of the evidence of record. (R. 44). However, after reviewing the opinion, it appears that the ALJ relied solely on the medical source statements and her credibility assessment in determining claimant's physical RFC. (R. 39-40, 43-44). An ALJ's RFC assessment must be based on *all* of the relevant evidence in the record, including, among other things, claimant's medical history and medical signs and findings in addition to medical source statements. SSR 96-8p. Because the ALJ failed to articulate her analysis of claimant's medical history or the medical signs and findings supporting claimant's alleged limitations, the ALJ did not comply with SSR 96-8p. Moreover, the ALJ's opinion does not assure us that she considered the important evidence or allow us to trace the path of her reasoning. Consequently, remand is appropriate because the ALJ's physical RFC determination is not supported by substantial evidence or free from legal error.

**B.    The ALJ Properly Evaluated the Medical Opinions and Explained the Weight Given to Treating Source Opinions.**

Next, the claimant contends that the ALJ failed to assign proper weight to treating source opinions and rejected Dr. Gonzalez's opinion without adequate reason. We disagree. The ALJ found that Dr. An's opinion was entitled to greater weight than Dr. Gonzalez's opinion because: (1) Dr. An performed claimant's surgery, (2) he was an orthopedic specialist who treated claimant for a lengthy period of time, (3) Dr. Gonzalez

repeatedly referred claimant to specialists, and (4) Dr. Gonzalez's opinion was not consistent with the opinions of many specialists who treated claimant extensively. (R. 40). The ALJ properly considered the factors set forth in 20 C.F.R. § 404.1527(d) and explained why she gave more credit to Dr. An's opinion. Moreover, the ALJ is responsible for evaluating all of the medical opinions, determining the weight to give each opinion and resolving any conflicts. *Diaz*, 55 F.3d at 306, n.2. ALJ Cropper did just that and we see no reason to remand on this issue.

## V. The ALJ's Credibility Determination Is Not "Patently Wrong."

Keys also contends that the ALJ erred in rejecting his credibility. To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). We will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong." *Id.*

Here, the ALJ based her credibility determination on a number of facts and observations. The ALJ noted that claimant's objective physical abnormalities have been repeatedly described as minor and that he had relatively normal neurological exams by both treating and examining physicians. (R. 43). The ALJ also observed that claimant's neurosurgeon was pleased with his recovery after surgery and released him to work after a short recovery period. (*Id.*). Furthermore, the ALJ noted that several doctors indicated that claimant had made a poor effort during examinations and that there was evidence of symptom magnification. (*Id.*).

The ALJ also found that claimant's testimony about his failure to seek more frequent

treatment for his constant, unbearable back pain after he recovered from surgery was not credible. (*Id.*).  The ALJ noted that while claimant testified that he did not pursue additional treatment because of financial constraints, he had Medicaid coverage for a period of time and received treatment from Oak Forest Hospital when he lacked coverage. (*Id.*).

The ALJ also found claimant's testimony about his depression to lack credibility because: (1) claimant denied feelings of depression in the past, (2) the majority of his doctors (other than Dr. Gonzalez) failed to note any complaints of depression or any abnormal mental status, (3) claimant was not referred for a psychiatric evaluation or treatment until shortly before the hearing and (4) he had not been prescribed any anti-depressant medication. (*Id.*).

ALJ Cropper further observed that claimant made inconsistent and exaggerated statements about facts not related to his limitations. (*Id.*).  Based on all of these factors combined, the ALJ gave little credit to the claimant's testimony and his description of his limitations. (*Id.*).

Claimant argues that the ALJ failed to comply with the requirements of SSR 96-7p.[7] We disagree.  The ALJ set forth in detail all of the factors she considered in assessing claimant's credibility and we find that the ALJ complied with SSR 96-7p. (R. 40-43).

Claimant also contends that the ALJ devalued his major back surgery and placed unsubstantiated emphasis on facts unrelated to his limitations.  First, the ALJ did not

---

[7]  Pursuant to SSR 96-7p, the ALJ was required to consider claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; his course of treatment; any treatment other than medication that he uses or has used to relieve his symptoms; and any other factors concerning his functional limitations and restrictions due to his pain or other symptoms.

devalue claimant's major back surgery. To the contrary, the ALJ clearly considered claimant's surgery as well as his recovery and complaints of pain following the surgery. (R. 43). Second, the ALJ noted claimant's inconsistent and exaggerated statements about facts unrelated to his limitations as one of many factors that contributed to her credibility assessment. This Court finds that the ALJ did not place unsubstantiated emphasis on claimant's inconsistent and exaggerated statements.

Finally, claimant argues that none of his activities are inconsistent with suffering from severe back pain and therefore, they are not sufficient to disregard his testimony. However, the ALJ did not find that claimant lacked credibility because his activities were inconsistent with his complaints of pain. Rather, the ALJ considered a number of factors discussed above and, based on those factors, she determined that claimant's testimony and descriptions of his limitations were not credible.

Based on the foregoing, this Court finds that the facts and observations noted by the ALJ provide support for the ALJ's credibility determination. (R. 43). Thus, we cannot conclude that the ALJ's credibility determination was patently wrong. Accordingly, we will not remand on this basis. *Powers*, 207 F.3d at 435; *see also, Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record).

**CONCLUSION**

For the reasons set forth above, Keys' motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

_____
**MICHAEL T. MASON**
**United Stated Magistrate Judge**

**Dated: April 25, 2006**